UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

ALL PETROLEUM-PRODUCT CARGO
ABOARD THE M/T ARINA,

      Defendant In Rem,

ALL PETROLEUM-PRODUCT CARGO
ABOARD THE M/T NOSTOS,

      Defendant In Rem,

    - and -

ASPAN PETROKIMYA CO.,

      Claimant.

Civil Action No. 21-3234 (RDM)
[consolidated]

**UNITED STATES' VERIFIED AMENDED AND CONSOLIDATED
COMPLAINT FOR FORFEITURE _IN REM_**

Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia, brings this verified complaint for forfeiture in a civil action in rem against the defendant property (the "Defendant Property), namely all petroleum-product previously onboard two motor tankers—the M/T Arina bearing International Maritime Organization ("IMO") No. 9189985 (the "Arina") and the M/T Nostos bearing IMO No. 9258014 (the "Nostos") (collectively, the "Vessels")—which, pursuant to interlocutory sale orders issued by the Court, have been sold and the substitute res is now as reported in the United States' accountings filed with the Court.

**NATURE OF ACTION AND THE DEFENDANT IN REM**

1.    This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI") and Homeland Security Investigations ("HSI") involving Iran's transportation and sale of oil products to benefit sanctioned Iranian entities.  This action seeks to forfeit the Defendant Property, which originated from an oil terminal in Iran where it was loaded onto an Iranian oil tanker and then transferred to other vessels using surreptitious means to hide the Defendant Property's Iranian origin, moving the cargo into commerce by, and for the benefit of, the National Iranian Oil Company ("NIOC"), the National Iranian Tanker Company ("NITC"), the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Qods Force ("IRGC-QF") (collectively, the "Iranian State Actors"), each of which has been designated by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia.

2.    The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as foreign assets: (i) of an entity or organization engaged in the planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property: or (ii) affording a person a source of influence over such entity or organization.

**JURISDICTION AND VENUE**

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.    Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2).

5.    Pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b), this Court has jurisdiction for property subject to forfeiture on the high seas.

**FACTS GIVING RISE TO FORFEITURE**

**I.     Relevant Participants in the Iranian Oil Industry**

**A.     The Islamic Revolutionary Guard Corps (IRGC) and the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF).**

6.     The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system.   The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.   IRGC-QF's "support for terrorism [is] well known" *Hake v. Bank Markazi Jomhouri Islami Iran*, Civ. A. No. 17-0114 (TJK), 2022 WL 4130837, at *11 (D.D.C. Sept. 12, 2022).

7.     The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking."  https://home.treasury.gov/news/press-releases/tg1718.

8.     According to OFAC, "[t]he IRGC and its major holdings . . . have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses." https://home.treasury.gov/news/press-releases/sm703.

9.     The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil.  Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries . . . to obfuscate its involvement in selling Iranian oil."  https://home.treasury.gov/news/press-releases/sm767; *see also* https://home.treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.").

10. The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." https://home.treasury.gov/news/press-releases/sm703.

11. The IRGC generates substantial revenues from the sale of petroleum products. For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars." https://home.treasury.gov/news/press-releases/sm767.

12. The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities. For example, OFAC has found that: "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East." https://home.treasury.gov/news/press-releases/sm885; *see also* https://home.treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.").

13. The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." https://home.treasury.gov/news/press-releases/sm885.

14.     On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm.  In part, OFAC found that the IRGC-QF "provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command[.]" *Id.*

15.     On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF.  *See* https://home.treasury.gov/news/press-releases/sm0177.

16.     On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189).  *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/.  The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism." *Id.*

17.     On April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF.  *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html.   That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." *Id.*

18.     On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA.  *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.

federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

19.     IRGC-QF official Rostam Qasemi (a/k/a Rostam Ghasemi), who previously served as the Iranian Minister of Petroleum from 2011 to 2013, "manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil." https://home.treasury.gov/news/press-releases/sm767. On September 4, 2019, OFAC designated Qasemi "for acting for or on behalf of the IRGC-QF and IRGC-QF Commander Qasem Soleimani." *Id.* Following the death of Soleimani in 2020, Qasemi "assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

20.     The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States, affecting U.S. commerce.  The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

a.     In likely retaliation for the death of former IRGC-QF commander Qasem Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed plot to commit murder-for-hire and provide material support to a transnational murder plot targeting former National Security Advisor John Bolton, https://www.justice.gov/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

b.     In 2021, "[t]hrough the IRGC-QF, Iran continued its support to several U.S.-designated terrorist groups, providing funding, training, weapons, and equipment to

various groups within the region. . . . Iran-backed militias continued sporadic attacks on [the U.S.] Embassy [in] Baghdad and bases hosting U.S. and other Defeat-ISIS forces in Iraq and Syria[,]" State Dep't 2021 Country Reports on Terrorism, at 125-26, available at: https://www.state.gov/wp-content/uploads/2023/02/Country_Reports_2021_Complete_MASTER.no_maps-011323-Accessible.pdf.

c.        In 2021, "Iran pursued or supported terrorist attacks against Israeli targets in 2021, including . . . a January bomb attack outside the Israeli embassy in New Delhi for which the Indian government said the IRGC-QF was responsible," *id.* at 215.

d.        From 2006 to 2009, a series of terrorist attacks by a group funded and supplied by the IRGC-QF killed or severely injured U.S. military servicemembers and civilians, *see Neiberger v. Islamic Republic of Iran*, Civ. A. No. 16-2193 (EGS/ZMF), 2022 WL 17370239, at *1 (D.D.C. Sept. 8, 2022).

e.        In 2007, the IRGC-QF continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that killed thousands of U.S. forces, and explosively formed penetrators that have a higher lethality rate than other types of improvised explosive devices, and were specially designed to defeat armored vehicles used by U.S. forces in Iraq, *see Burks v. Islamic Republic of Iran*, Civ. A. No. 16-1102 (CRC), 2020 WL 13303322, at *2 (D.D.C. Aug. 21, 2020).

f.        In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/; *see also Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 488 (D.D.C. 2021) (Mehta, J.).

g.     In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010).  IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack.  *Id.*

21.     Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and abroad.  Indeed, the entire purpose of the IRGC and IRGC-QF's campaigns of terror are to thwart the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries.  *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States").  These terrorist activities undertaken in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

**B.     National Iranian Oil Company (NIOC) and Its Subsidiaries**

22.     The Iranian Ministry of Petroleum oversees NIOC, which "is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran." *See* https://home.treasury.gov/news/press-releases/sm1165.

23.     As this Court has noted, "NIOC is one of the world's largest oil companies and generates billions of dollars in revenue each year[.]" *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 110 (D.D.C. 2021) (Moss, J.) (cleaned up).  "[I]t functions primarily as a commercial

entity aimed at the production and sale of oil." *Est. of Fishbeck v. Islamic Republic of Iran*, Civ. A. No. 18-2248 (CRC), 2021 WL 6808189, at *3 (D.D.C. Mar. 1, 2021).

24.    According to OFAC, NIOC is "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies." *See* https://home.treasury.gov/news/press-releases/sm885.    Indeed, as this Court has noted, NIOC "after funding its own operations and making investments in Iran's oil industry, its revenue goes to fund the Iranian government[,]" which "depending on the price of oil, revenue from NIOC is between one-third and two-thirds of the Iranian government's total revenue." *Holladay*, 523 F. Supp. 3d at 110 (quoting declaration).

25.    OFAC has found that NIOC supplies crude oil and condensate sold by the IRGC-QF.  *See* https://home.treasury.gov/news/press-releases/sm767.

26.    On September 24, 2012, the U.S.  Department of the Treasury submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012, finding that NIOC was an agent or affiliate of the IRGC.  *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

27.    On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

28.    In designating and reporting on the activities of NIOC, the Treasury Department made clear that NIOC's efforts are not limited to the domestic borders of Iran, but instead, NIOC undertakes efforts in foreign commerce contrary to the interests of the United States.  For example:

a.    in designating NIOC, OFAC noted that NIOC engaged in foreign commerce with the illegitimate Maduro regime in Venezuela, including by "charter[ing] multiple vessels to support the transport of tens of thousands of metric tons of gasoline destined for Venezuela[,]" *id.*;

b.    in designating entities working with NIOC, OFAC noted that NIOC worked with such entities to facilitate shipments of Iranian petroleum to foreign customers of NIOC, *see* https://home.treasury.gov/news/press-releases/jy1115;

c.    NIOC has entered into fossil fuel supply contracts with foreign organizations, committing itself to provide energy products to foreign companies, *see, e.g., Crescent Petroleum Co. v. Nat'l Iranian Oil Co.*, Civ. A. No. 22-1361 (JMC) (D.D.C. filed May 16, 2022), ECF No. 1 (Compl.) ¶¶ 1-2, 10-15, and using U.S. dollars to transact its business, *id.* ¶ 37; *see also id.*, ECF No. 1-6 at 23; and

d.    NIOC has entered into agreements to develop oil and gas fields with a Russian-owned energy company, Gazprom, which OFAC has designated under Executive Order 14,0424, as being Russian-government affiliated entities.  *See* https://www.reuters.com/business/energy/iran-russias-gazprom-sign-primary-deal-energy-cooperation-2022-07-19/

29.    NIOC's use of foreign commerce to fund and provide material support to the IRGC and IRGC-QF thwart U.S. interests not just by providing a means to finance the wrongful actions of the IRGC and IRGC-QF, which plainly affect commerce with the United States, but also by providing support to regimes hostile to U.S. interests, including Russia.  *See Sealed Case*, 936 F.3d at 589-50 (foreign commerce power allows Congress to outlaw activities "that lends financial support to terrorist organizations in foreign countries when that support merely 'affects' commerce

with the United States"). These activities undertaken in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

30. NIOC operates through itself and several subsidiaries or components, including NITC and Naftiran Intertrade Co. (NICO) Limited ("Naftiran Intertrade").

i. *National Iranian Tanker Company (NITC)*

31. NITC is a subsidiary of NIOC and "is responsible for the transportation of Iranian crude exports." *See* https://home.treasury.gov/news/press-releases/sm1165.

32. According to OFAC, "NITC has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah," *id.*, and has provided vessels for use in IRGC-QF oil operations, s*ee* https://home.treasury.gov/news/press-releases/sm767.

33. NITC has used front companies to obscure its involvement in such oil shipments. *See* https://home.treasury.gov/news/press-releases/sm1165 ("Furthermore, in order to obfuscate its involvement in shipping activity, NITC set up a front company in the United Arab Emirates (UAE), Atlas Ship Management. NITC officials also arranged to create a separate UAE-based front company, Atlantic Ship Management Company, ostensibly as an entity to replace Atlas Ship Management.").

34. On November 5, 2018, OFAC designated NITC pursuant to Executive Order 13,599 for its connections to the Government of Iran and its role in the Iranian shipping sector. *See* https://home.treasury.gov/news/press-releases/sm541.

35. On October 26, 2020, OFAC designated NITC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

- 11 -

ii.        *Naftiran Intertrade Co. Limited a/k/a NICO (Naftiran Intertrade).*

36.    Naftiran Intertrade Company Ltd. ("Naftiran Intertrade") is a Switzerland-based subsidiary of NIOC and acts as the marketing arm of NIOC.  *See* https://home.treasury.gov/news/press-releases/hp1299; https://home.treasury.gov/news/press-releases/jy1115; https://home.treasury.gov/news/press-releases/sm1165

37.    OFAC has included Naftiran Intertrade on its SDN List and identified it as being owned or controlled by the Iranian government pursuant to Executive Order 13,599.  *See* https://home.treasury.gov/news/press-releases/hp1299.

38.    Naftiran Intertrade is a key player in Iran's energy sector and historically has purchased most of Iran's gasoline imports.  *See* Time, *Sleeping with the Enemy: BP's Deals with Iran*, available at https://web.archive.org/web/20100618113610/http://www.time.com/time/nation/article/0,8599,1996921,00.html  (Jun. 16, 2010).

## II.    **Importance of Petroleum and Shipping Industries to the IRGC.**

39.    OFAC has observed that IRGC-QF deliberately utilizes a "complex network of intermediaries," including "dozens of ship managers, vessels, and facilitators," for the purpose of "obfuscate[ing] its involvement in selling Iranian oil." *See* https://home.treasury.gov/news/press-releases/sm767.

40.    In spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil and had taken steps to hide Iranian, IRGC, and NIOC involvement in certain transactions.  *Id.*  These shipments, taken collectively, sold for more than half a billion dollars.  *Id.*  The same network also sold nearly 4 million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars.  *Id.*

41.    In designating NIOC and NITC under Executive Order 13,224, OFAC reported: "NIOC and NITC provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.   "The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF." *Id.*

42.    According to OFAC, the IRGC uses the proceeds from its involvement in the oil industry and other sectors of the Iranian economy to "support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad." *See* https://home.treasury.gov/news/press-releases/sm703.

43.    OFAC has reported that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East." *See* https://home.treasury.gov/news/press-releases/sm885.    Then-Treasury Secretary Mnuchin added: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." *Id.*

### III.    The Defendant Property Originated from Kharg Island, Iran, and Was Loaded Onto The Vessels in Furtherance of the Illicit Activities of the Iranian State Actors.

44.    On November 5, 2018, OFAC placed an NITC-owned and operated oil tanker, the M/T Stark I bearing IMO No. 9171450) (the "Stark I"), on its Specially Designated Nationals and Blocked Persons List ("SDN List") due to Stark I's ties to NITC.  *See* Notice of OFAC Sanctions Actions, 85 Fed. Reg. 18,334 (Apr.  1, 2020).

45.     On or around, October 15, 2020, the Stark I repainted its deck in Bandar Abbas, Iran, in an apparent attempt to disguise the vessel and avoid detection by satellite imagery.

46.     On or around October 31, 2020, the Stark I pulled into anchorage at Kharg Island, Iran, and loaded the Defendant Property.

47.     Thereafter, the Stark I traveled west and met up with the Arina at approximately the coordinates of 29.29123 degrees north, 49.34743 degrees east on November 3, 2020.

48.     The position of Arina and Stark I relative to Kharg Island at their rendezvous is depicted in the below commercially available satellite imagery in the red box.



49.     The same imagery zoomed below at approximately the coordinates of 29.29123 degrees north, 49.34743 degrees east on November 3, 2020, depicts the two ships side-by-side.



50.     The Arina had ceased Automatic Identification System ("AIS") transponder transmissions a day earlier, on November 2, 2020, where it reported its position as 29.29437 degrees north, 49.33168 degrees east off the coasts of Iraq, Kuwait, and Iran, approximately in the middle of the Persian Gulf.

51.     At the time of its last AIS transmission on November 2, 2020, the Arina indicated its draft depth as being 8.1 meters and its destination as being Basrah, Iraq.

52.     At the time, the Arina had been an active carrier of Iranian oil, having previously loaded and shipped Iranian petroleum in both November 2019 and June 2020.  For example, approximately six months before the Arina obtained the Defendant Property, it engaged in a similar illicit shipment of Iranian petroleum from Kharg Island, Iran, which was similarly transferred via ship-to-ship transfer from an Iranian-flagged tanker, and false documents were similarly created to show the petroleum was of Omani-origin.  NIOC served as the consignor for that shipment.

53.     After meeting up with the Stark I when its AIS transponder was inactive, Arina returned to the AIS grid on November 6, 2020.

54.     On November 6, 2020, the Arina reported that its draft depth had changed to 14.9 meters and that its destination had changed to be Sohar, Oman.

55.     By updating its draft depth from 8.1 meters to 14.9 meters, the Arina indicated it was fully laden with liquid cargo.

56.     Certificate of Origin documents generated by NIOC indicate that the Arina was loaded by ship-to-ship transfer on November 4 and 5, 2020, with Iranian crude oil with the consignor listed as NIOC and the consignee listed as Naftiran Intertrade.

- 15 -

57.    An ullage report issued by an Iranian inspection service dated November 5, 2020, for the Arina confirmed it had taken on Iranian crude oil at Kharg Island, Iran totaling 733,876 net barrels.

58.    Despite the clear Iranian origins of the Arina's cargo, shipping documents cited by Claimant Aspan Petrokimya Co. ("Aspan") in its Verified Claim in this matter falsely attest to the cargo as being of Omani origin and falsely suggest the Arina loaded such cargo at the Port of Sohar in Oman.

59.    While the Arina, after loading its Iranian-sourced petroleum from the Stark I, traveled to Sohar, Oman, arriving on November 11, 2020, at anchorage in Sohar, the Arina did not transfer any of its cargo to any other vessel, and as noted above, it had already reported through AIS that it was fully laden after its off-the-grid meet-up with the Stark I.

60.    Thereafter, the Arina traveled for the next nine months while continuing to be fully laden with liquid cargo after its ship-to-ship transfer with the Stark I—transiting from the Persian Gulf to the Arabian Sea, back to the Persian Gulf, then around the Arabian Peninsula up to the Red Sea through the Suez Canal, then across the Mediterranean Sea up through the Bosporus Canal into the Black Sea, and then back through the Bosporus Canal and into the Mediterranean Sea to a position just north of Cyprus.

61.    On or about August 25, 2021, the Arina pulled along-side the Nostos at approximately 34.48849 degrees north, 33.33721 degrees east, off the northwest coast of Cyprus, where the Nostos reported it was in ballast or empty of cargo.

62.    Following that meet-up, the Arina reported its draft depth had changed from 14.9 meters to 11.7 meters, indicating it had offloaded a portion of the cargo it had received from the Stark I to the Nostos.

63.    Similarly, the Nostos reported its draft depth had changed from 7.5 meters to 9.5 meters after the ship-to-ship transfer with the Arina.

**COUNT ONE – FORFEITURE**
**(18 U.S.C. § 981(a)(1)(G)(i))**

64.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 63 above as if fully set forth herein.

65.    Under numerous theories, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(G).

**A.    The Defendant Property is the Property of NIOC or its Subsidiaries (NITC or Naftiran Intertrade), Which Have Perpetrated and Are Perpetrating a Federal Crime of Terrorism.**

66.    The Defendant Property is the property of NIOC or its subsidiaries (NITC or Naftiran Intertrade), which have perpetrated a federal crime of terrorism themselves, namely knowingly providing material support to a designated terrorist organization.

67.    In transferring the Defendant Property for the purposes of sale, NIOC and its subsidiaries (NITC and Naftiran Intertrade) provided or attempted to provide resources to IRGC or IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

68.    18 U.S.C. § 2339B prohibits persons from knowingly providing material support or resources to a foreign terrorist organization or conspiring to do so.

69.    As noted above, the IRGC and IRGC-QF are federal terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189.

70.    As described above, by selling or facilitating the sale of the Defendant Property, NIOC and its subsidiaries knowingly sought to aid the IRGC and IRGC-QF by providing a source of funding to them.

71.    NIOC and its subsidiaries' knowing material support of the IRGC and IRGC-QF occurred in foreign commerce as NIOC and its subsidiaries sought to peddle the Defendant Property to foreign purchasers, including using doctored records from a foreign country.

72.    NIOC and its subsidiaries' use of foreign commerce to provide material support to the IRGC and IRGC-QF has a sufficient nexus to the United States as the IRGC and IRGC-QF's wrongful actions affect U.S. commerce, including by killing U.S. nationals, and the introduction of billions of dollars of oil annually into the black market has predictable effects on the price of petroleum and other fossil fuels in the United States as crude oil and other fossil fuels are global commodities.  *See, e.g.,* CNBC, *An Iran nuclear deal revival could dramatically alter oil prices—if it happens*, available at: https://www.cnbc.com/2022/08/31/an-iran-nuclear-deal-revival-could-dramatically-alter-oil-prices.html (Aug. 31, 2022); Reuters, *Oil prices sink $2/bbl on possible Iran oil exports, rising interest rates*, available at: https://www.reuters.com/business/energy/oil-prices-rise-possible-opec-supply-cuts-2022-08-25/ (Aug. 25, 2022) ("Oil prices slumped by about $2 a barrel on Thursday in volatile trade as investors braced for the possible return to global markets of sanctioned Iranian oil exports and on worries that rising U.S. interest rates would weaken fuel demand."); World Bank Group, Middle East and North Africa Region, Office of the Chief Economist, *Lifting Economic Sanctions on Iran: Global Effects and Strategic Responses* (Feb. 2016), available at: https://documents1.worldbank.org/curated/en/298681467999709496/pdf/WPS7549.pdf ("The lifting of sanctions will have the strongest effect on oil production in Iran, and petroleum and coal products in Israel, the EU, and the US[.]").

73.    The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as an asset of an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

**B.**     **The Defendant Property is the Property of NIOC or its Subsidiaries (NITC or Naftiran Intertrade), Which Afford Them a Source of Influence Over the IRGC an IRGC-QF.**

74.     The Defendant Property is the property of NIOC or its subsidiaries (NITC or Naftiran Intertrade), which affords them a source of influence over the IRGC and IRGC-QF, entities which have engaged in federal crimes of terrorism.

75.     As noted above, the IRGC and IRGC-QF are federal terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189.

76.     The IRGC and IRGC-QF have committed numerous terrorism-related offenses by identified in 18 U.S.C. § 2332b(g)(5), including the killing and attempts to kill U.S. personnel proscribed by 18 U.S.C. § 1114.

77.     NIOC and its subsidiaries' efforts to sell and facilitate the sale of the Defendant Property were critical to furthering the affairs of the IRGC and IRGC-QF as "the profits from Iran's oil industry are its 'financial lifeline.'" *United States v. All Petroleum-Prod. Cargo Aboard the Bella*, Civ. A. No. 20-1791 (JEB), 2021 WL 4502056, at *4 (D.D.C. Oct. 1, 2021).  Indeed, such activities concerning the Defendant Property were used to further the affairs of the IRGC and IRGC-QF's terrorist enterprise and to make their prohibited conduct less difficult.

78.     The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

### C. Alternatively, the Defendant Property is the Property of Aspan, Which Affords It a Source of Influence Over NIOC and Its Subsidiaries, the IRGC, and/or the IRGC-QF.

79.    Alternatively, the Defendant Property is the property of Aspan, which affords it a source of influence over NIOC or its subsidiaries (NITC or Naftiran Intertrade), the IRGC, and/or IRGC-QF, entities which have engaged in federal crimes of terrorism.

80.    As noted above, the IRGC and IRGC-QF are federal terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189, and that have committed federal crimes of terrorism identified in 18 U.S.C. § 2332B(g)(5).

81.    As noted above, NIOC and its subsidiaries (NITC or Naftiran Intertrade) have themselves engaged in planning or perpetrating a federal crime of terrorism, namely knowingly providing material support to the IRGC and IRGC-QF.

82.    Aspan's purported purchase of the Defendant Property was critical to furthering the affairs of the IRGC and IRGC-QF as "the profits from Iran's oil industry are its 'financial lifeline.'" *Bella*, 2021 WL 4502056, at *4.  Indeed, without firms acting as purchasers of Iranian-sourced petroleum, the efforts of the Iranian State Actors to obtain financing for the terrorist activities of the IRGC and IRGC-QF would fail.  Accordingly, were the Defendant Property the property of Aspan, Aspan's purchase of the Iranian-sourced petroleum made the prohibited conduct of NIOC or its subsidiaries (NITC or Naftiran Intertrade), the IRGC, and IRGC-QF less difficult.

83.    The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Property be forfeited to the United States for disposition according to law; and that the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: May 15, 2023
      Washington, DC

                        Respectfully submitted,

                        MATTHEW M. GRAVES, D.C. Bar #481052
                        United States Attorney

                        By:        */s/ Brian P. Hudak*
                        BRIAN P. HUDAK
                        Chief, Civil Division
                        DEREK HAMMOND, D.C. Bar #1017784
                        Assistant United States Attorney
                        U.S. Attorney's Office
                        601 D Street, NW
                        Washington, DC 20530
                        (202) 252-2549

                        *Attorneys for the United States of America*

## <u>VERIFICATION</u>

I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by others, including other law enforcement representatives, and that everything represented herein is true and correct to the best of my knowledge and belief.

Executed on this 15th day of May 2023.


       */s/ Cindy Burnham*
Special Agent Cindy Burnham
Federal Bureau of Investigation

- 22 -